GCMNMTAC

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   JOHN SAMUELSEN,

 4                Plaintiff,

 5          v.                              16 Civ. 9336 (PGG)

 6   METROPOLITAN TRANSPORTATION
     AUTHORITY ,
 7
                 Defendant.
 8
     ------------------------------x
 9
                                           New York, N.Y.
10                                         December 22, 2016
                                           4:15 p.m.
11
     Before:
12
                      HON. PAUL G. GARDEPHE,
13
                                           District Judge
14
                          APPEARANCES
15
     ADVOCATES FOR JUSTICE CHARTERED ATTORNEYS
16        Attorneys for Plaintiff
     BY:  ARTHUR Z. SCHWARTZ
17
     DAVIS WRIGHT TREMAINE LLP
18        Attorneys for Defendant
     BY:  LINDA J. STEINMAN
19
     METROPOLITAN TRANSIT AUTHORITY
20   BY:  PETER A. SISTROM

21

22

23

24

25

GCMNMTAC

1        (Case called)

2        THE COURT:  This is a continuation of a hearing on

3   plaintiff's application for a preliminary injunction.

4        Plaintiff John Samuelsen is the president of the

5   Transport Workers Union of Greater New York, Local 100, which I

6   will refer to as the Union, citing the Amended Complaint,

7   Docket No. 14, at paragraph 3.

8        Defendant Metropolitan Transportation Authority, which

9   I will refer to as the MTA, is a New York state public

10  authority and public benefit corporation responsible for the

11  operation of mass transportation services, including railroads,

12  buses and subways in the New York City metropolitan area, *Id.*

13  at 4, paragraph 4.

14       The Union is the collective bargaining agent for

15  approximately 38,000 MTA employees.  *Id.* at paragraph 3.

16       The Union's collective bargaining agreements with

17  three MTA subsidiaries -- the New York City Transit Authority,

18  the MTA Bus Authority, and the Manhattan and Bronx Surface

19  Transit Operating Authority -- will expire on January 15, 2017.

20  *Id.* at paragraph 5.

21       Negotiations for new collective bargaining agreements

22  are in progress, and the Union and the MTA are at odds over

23  wages, among other issues.  *Id.*

24       The Union has asked to purchase $190,000 in

25  advertising space in the New York City subway system and on

GCMNMTAC

transit authority buses.  *Id.* at paragraph 7.

The MTA denied the Union's request on the grounds that its proposed advertisements are political in nature and thereby prohibited under the MTA's advertising policy.  Plaintiff seeks to enjoin the MTA from enforcing the policy and refusing to sell advertising space, arguing that the restriction violates the First Amendment.

The parties' submissions present three legal issues:

First, whether the MTA's current advertising policy, which was adopted at the end of April 2015, has converted the MTA's advertising space from a designated public forum to a limited public forum;

Second, whether the MTA's advertising policy violates the First Amendment on its face; and,

Third, whether the MTA's advertising policy violates the First Amendment as applied to plaintiff.

Before I turn to these legal issues, I will give a little background concerning the proposed advertisement, the MTA's current advertising policy, and the MTA's response to the Union's request to purchase advertising space.

The Union has undertaken a public campaign -- which I will refer to as the Wage Increase Campaign -- to support its position in the collective bargaining negotiations.  *Id.* at paragraph 6.

On November 14, 2016, at the direction of plaintiff

GCMNMTAC

1    Samuelsen, the Union submitted a request to the MTA to purchase

2    $190,000 in advertising space in the New York City Transit

3    Authority subway system and on transit authority buses.  *Id.* at

4    paragraph 7.

5         The proposed advertisement states, "Every 36 hours a

6    transit worker is assaulted on the job.  We deserve a wage

7    increase for our sacrifices."  *Id.*, Exhibit A.  Photos of the

8    injured workers accompany the text.  *Id.*

9         As to the MTA's advertising policy, the MTA sells

10   advertising space in its subway and bus systems in order to

11   raise revenue to help support its operation, citing the Rosen

12   Declaration, Docket No. 20, at paragraph 4.  Between 1994 and

13   2015, the MTA accepted commercial and noncommercial

14   advertisements, including political advertisements.  *See Id.*,

15   at paragraphs 9-12, and 29, also Exhibits A and B.

16        In recent years the MTA saw a surge in divisive

17   political advertisements about political issues and religion in

18   the Middle East.  *Id.* at paragraph 16-22.

19        The MTA rejected some of these advertisements, but

20   found itself embroiled in First Amendment litigation.  *Id.* at

21   paragraph 17.  Litigants relied on the high standard of review

22   applicable to designated public forums.  *Id.* at paragraphs 11

23   and 17.

24        On April 29, 2015, the MTA adopted a new advertising

25   policy that reflects two major changes:

GCMNMTAC

1          First, the new policy limits the range of permissible

2   advertisements to commercial advertising, governmental

3   advertising, and public service announcements.  Citing the

4   Amended Complaint, Exhibit C, Docket No. 14-3, at Section IV(A)

5          Second, the new policy prohibits advertisements that

6   are "political in nature."  *Id.* at Section IV(B)(2).  The

7   phrase "political in nature" is defined as "including but not

8   limited to advertisements that either:

9          "(1) are directed or addressed to the action,

10   inaction, prospective action or policies of a governmental

11   entity . . .; or,

12          "(2) Prominently or predominantly advocate or express

13   a political message, including but not limited to an opinion,

14   position, or viewpoint regarding disputed economic, political,

15   moral, religious or social issues or related matters or support

16   for or opposition to disputed issues or causes."  *Id.*

17          The MTA's purpose in adopting the new policy was to

18   "convert the MTA's property from a designated public forum into

19   a limited public forum."  *Id.* at Section I(B).

20          The MTA has entered into license agreements with

21   outside advertising firms, including Outfront Media Inc. to

22   manage its paid advertise program.  Citing the Rosen

23   Declaration, Docket No. 20, in paragraphs 6-7.

24          As to the MTA's denial of the Union's proposed

25   advertisement, on November 21, 2016, the MTA considered and

GCMNMTAC

rejected the Union's request to purchase advertising space for

its Wage Increase Campaign.  Citing the Amended Complaint,

Docket No. 14, at paragraph 8.  Outfront Media, acting on

behalf of the MTA sent an e-mail to the Union stating that the

proposed advertisement is "issue oriented" and thus constitutes

"prohibited advertising" as defined on page 3, Item B of the

MTA's advertising policy.  *Id.* at paragraph 8, Exhibit B.  This

action was then filed on December 4, 2016.

As to the legal standard that applies on an

application for preliminary injunction, a Court may issue a

preliminary injunction only where first,

"The plaintiff has demonstrated either (a) a

likelihood of success on the merits, or (b) sufficiently

serious questions going to the merits to make them a fair

ground for litigation and a balance of hardships tipping

decidedly in the plaintiff's favor.  Second, the court may

issue the injunction only if the plaintiff has demonstrated

that it is likely to suffer irreparable injury in the absence

of an injunction.  Third, a Court must consider the balance of

hardships between the plaintiff and defendant and issue the

injunction only if the balance of hardships tips in the

plaintiff's favor.  Finally, the court must ensure that the

public interest would not be disserved by the issuance of a

preliminary injunction."  Citing *Salinger v. Colting*, 607 F.3d

68, at 79-80 (2 Cir. 2010).

GCMNMTAC

1            "Where the movant seeks a mandatory injunction (one

2     that will alter the status quo) rather than a prohibitory

3     injunction (one that maintains the status quo) the

4     likelihood-of-success standard is elevated:  The movant must

5     show a clear or substantial likelihood of success."  Citing

6     *Hoblock v. Albany County Board of Elections*, 422 F.3d 77, at 97

7     (2d Cir. 2005).  Here, the Union asks the Court to require the

8     MTA to display its advertisements, which the MTA has -- until

9     now -- refused to do.  Since an injunction would alter the

10    status quo, the "clear or substantial likelihood of success"

11    standard applies.

12            As to the elements necessary to show that a

13    preliminary injunction should be granted, I will begin with

14    irreparable injury.

15            "When a plaintiff claims a violation of free speech,

16    as here, courts presume irreparable harm because the loss of

17    First Amendment freedoms, for even minimal periods of time,

18    unquestionably constitutes irreparable injury."  Citing *Vaguely*

19    *Qualified Productions LLC v. Metropolitan Transportation*

20    *Authority,* 2015 WL 5916699 at *7 (S.D.N.Y. October 7, 2015),

21    which in turn is quoting *New York Magazine v. Metropolitan*

22    *Transportation Authority*, 136 F.3d, 123 at 127 (2d Cir. 1998).

23    As to the element of a clear or substantial likelihood of

24    success, to determine the plaintiff's likelihood of success on

25    the merits, a Court must consider (1) whether in this instance

GCMNMTAC

plaintiff's ad is protected speech under the First Amendment
(2) the nature of the forum to which the MTA is limiting
access; and (3) whether the justifications for the restriction
satisfy the appropriate standard of review.  Citing *Cornelius
v. NAACP Legal Defense and Education Fund, Inc.*, 473 U.S. 788,
at 797 (1985).  Here, it is undisputed that the Union's
proposed advertisement constitutes protected speech.
Accordingly, I will turn to classification of the forum
established by the MTA's advertising policy.

      "When the government provides a forum for private
speech, the nature of that forum determines the level of
scrutiny that courts apply to government restrictions of that
speech."  Citing *American Freedom Defense Initiative v.
Metropolitan Transportation Authority,* 109 F.Supp.3d 626, at
631 (S.D.N.Y. 2015).  Citing *Cornelius*, 487 U.S. 800.  "The
categories from highest protection to lowest are the
traditional public forum, the designated public forum, the
limited public forum and the nonpublic forum."  Citing *DeFabio
v. East Hampton Union Free School District*, 658 F.Supp.2d 461
at 473 (E.D.N.Y. 2009).

      In a traditional public forum, content-based
restrictions will be uphold only if they satisfy strict
scrutiny -- that is, if they are "necessary to serve a
compelling state interest and are narrowly drawn to achieve
that end."  Citing *Peck v. Baldwinsville Central School*

GCMNMTAC

*District* 426 F.3d 617 at 626, (2d Cir. 2005).

"A designated public forum is a place not traditionally open to public assembly and debate . . . that the government has taken affirmative steps to open for general public discourse."  *Id.*  "So long as a forum remains public, government regulation of speech within it is subject to the same limitations as that govern a traditional public forum. Citing *Make the Road by Walking*, 378 F.3d at 143.  However, the government is "not required to indefinitely retain the open character" of a designated public forum.  Citing *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, at 46 (1983) and therefore" may decide to close a designated public forum.  Citing *Make the Road by Walking*, 378 F.3d at 143.

A limited public forum "exists where the government opens a nonpublic forum, but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects."  Citing *Hotel Employees and Restaurant Employees Union, Local 100 of New York v. City of New York, Department of Parks and Recreation*, 311 F.3d 534, 445 (2d Cir. 2002).  The "government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." *Id.* at 545-46.  In these fora "restrictions on speech that fall within the designated

GCMNMTAC

category for which the forum has been opened" are subject to strict scrutiny; however, restrictions on speech falling outside the designated category "need only be viewpoint neutral and reasonable." *Id.*

Before addressing the parties' arguments on the forum's classification, I will consider the nature of the forum to be classified.

The Union defines the relevant forum as encompassing the MTA' public facilities -- including "subway corridors and platforms," trains and buses.  Citing Plaintiff's Brief, Docket No. 8, at pages 10-11.  The MTA says that the relevant forum is the MTA's licensed advertising space.  Citing the Defendant's Brief, Docket No. 18, at pages 17-20.

Where a party "seeks access to a particular means of communication" as opposed to general access to public property, a court must "take a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property."  Citing *Cornelius*, 473 U.S. at 801.  The forum is defined "merely by identifying the government property at issue," but rather in terms of the "access sought by the speaker."*Id.*  (determining the relevant forum to be a charity drive to which petitioners sought access, rather than the "federal workplace" generally).

For example, in a case where a party sought "to compel the city to permit political advertising on city-owned buses,

GCMNMTAC

the [Supreme] Court treated the advertising spaces on the buses

as the forum," *Id.*  Citing *Lehman v. City of Shaker Heights*,

418 U.S 298 at 300 (1974).  Similarly, where a plaintiff sought

to place a political display on something called the

Spectacular, which is a large billboard in Penn Station, the

Second Circuit determined that the "forum inquiry must focus on

the Spectacular alone, rather than all Penn Station advertising

space," because plaintiff sought access to that billboard only.

Citing *Lebron v. National Railroad Passenger Corporation*, 69

F.3d 650, at 655 (2d Cir), *amended on denial of rehearing*, 89

F.3d 39, (2d Cir. 1995).  The *Lebron* court rejected the

plaintiff's effort to "broaden the public forum inquiry to

include spaces for which he had not sought access."  Citing

*Lebron*, 69 F.3d at 655-56.

         Here, I have concluded that the relevant forum is the

MTA's licensed advertising space.  As set forth in the Amended

Complaint, plaintiff seeks to buy $190,000 worth of advertising

space located on MTA buses and within MTA subway cars and

stations.  Citing the Amended Complaint, Docket No. 14, at

paragraph 7.  The Union's claims arise from the MTA's denial of

the proposed ad buy.  *See Id.*, paragraph 1.  For purposes of

the forum analysis then the "particular means of communication"

to which plaintiff seeks access includes only the MTA's

advertising space and not the MTA's public facilities more

generally.

GCMNMTAC

 1            In an effort to broaden the forum analysis inquiry,

 2    the Union's submissions referred to a recent display of post-it

 3    notes which were put on the walls of the Union Square subway

 4    station.  *Id.*, paragraphs 14-15.  The post-it notes contained

 5    messages about various political issues*.  Id.*  Also, Rosen

 6    Declaration, Docket No. 20, at paragraph 55.  Such postings or

 7    displays on subway station walls are addressed in separate MTA

 8    regulations that are not at issue here.  *See* Hudson

 9    Declaration, Docket No. 19, at paragraph 5.

10            In any event, the Union does not seek generalized

11    access to the subway corridor walls that once held the post-it

12    display.  Instead, the Union seeks access to the MTA's licensed

13    advertising space.  Access to this advertising space is

14    governed by the MTA's advertising policy.  Accordingly, the

15    forum relevant to plaintiff's First Amendment claims is the

16    MTA's licensed advertising space and not other portions of the

17    MTA's facilities.  Citing *Lebron*, 69 F.3d at 655-56.

18            Having defined the forum, the next step in the

19    analysis is to classify the forum.  The Union argues that the

20    MTA's advertising space qualifies as a designated public forum

21    and that any restrictions must satisfy strict scrutiny.  Citing

22    the Plaintiff's Brief, Docket No. 8, at pages 13 to 14 and

23    19-21.

24            The MTA contends, however, that its advertising space

25    qualifies as a limited public forum, subject to a more

GCMNMTAC

1   deferential standard of review.  Citing the Defendant's Brief

2   Docket No. 18 at pages 9-10 and 20-22.

3          "Whether government property is designated a public

4   forum or not depends on the government's intended purpose for

5   the property."  Citing *New York Magazine v. The Metropolitan*

6   *Transportation Authority*, 136 F.3d 123 at 129 (2d Cir. 1998).

7   in Determining government intent, courts examine "not only the

8   characteristics of the forum, but also the policies by which

9   the state governs the use of the forum," *Id.*  Where "the

10  government opened the property for speech in its proprietary

11  capacity for the purpose of raising revenue or facilitating the

12  conduct of its own internal business" courts have found the

13  forum to be "nonpublic." *Id.*  Citing *Lehman*, 418 U.S. at 303.

14         With respect to the policies governing speech in the

15  forum at issue, categorical exclusions of speech from the forum

16  are relevant to governmental intent.  While the mere fact that

17  the government excludes a category of speech through a rule or

18  standard does not render the forum "ipso facto a nonpublic

19  forum," courts may discern intent from "the nature of the

20  excluded categories [because they] shed light on whether the

21  government was acting primarily as a proprietor or a

22  regulator."  *Id.* at 130.  *See also Cornelius*, 473 U.S. at 805

23  ("The decision of the government to limit access to the [forum]

24  is not dispositive in itself.  Instead it is relevant for what

25  it suggests about the government's intent in creating the

GCMNMTAC

1    forum.").

2          In *New York Magazine*, the Second Circuit concluded

3    that the MTA's prior advertising policy, which was in place

4    from 1994 to April 2015, created a designated public forum in

5    the MTA's licensed advertising space.  Citing *New York*

6    *Magazine*, 136 F.3d at 129-30.

7          In considering MTA's intent under the prior

8    advertising policy, the Second Circuit observed that:

9          "Disallowing political speech and allowing commercial

10   speech only indicates that making money is the main goal.

11   Allowing political speech, conversely, evidences a general

12   intent to open a space for discourse, and a deliberate

13   acceptance of the possibility of clashes of opinion and

14   controversy inconsistent with sound commercial practice."

15         *Id.* at 130.

16         Since the MTA's prior policy "accepted both political

17   and commercial advertising," the court concluded that the

18   "advertising space on the outside of MTA buses is a designated

19   public forum."  *Id.*

20         As I noted at the outset, the MTA's current

21   advertising policy, adopted in April 2015, excludes

22   advertisements that are political in nature.  And contrary to

23   the Union's argument on Tuesday, "the government may decide to

24   close what had been a designated public forum."  Citing *Make*

25   *the Road by Walking*, 378 F.3d at 143.  *See also American*

GCMNMTAC

1   *Freedom Defense Initiative v. Metropolitan Transportation*

2   *Authority*, 109 F.Supp.3d 626, at 632 (S.D.N.Y. 2015).  ("The

3   MTA is not required to indefinitely retain the open character

4   of its property.")  The issue raised by the MTA's new

5   advertising policy is whether it evinces an intent to close the

6   forum.

7           Judge Koeltl considered the effects of the new policy

8   in *American Freedom Defense Initiative*, 109 F.Supp.3d 626.

9   Because the MTA's new advertising policy rendered plaintiff's

10  claim moot, Judge Koeltl was not required to rule on the forum

11  issue.  But he did observe that "it is likely that the MTA's

12  exclusion of all political ads has converted its advertising

13  space from a designated public forum to a limited public forum

14  or a nonpublic forum."  *Id.* at 623 to 633.  I agree with that

15  assessment.

16          The MTA's new advertising policy includes two major

17  changes.  Citing the Rosen Declaration, Docket No. 20, at

18  paragraph 5.

19          First, as I indicated, the new policy limits the range

20  of permissible advertisements to commercial advertising,

21  governmental advertising, and public service announcements.

22  Citing the Amended Complaint, Exhibit C, Docket No. 14-3, at

23  Section IV(A).

24          Second, the new policy prohibits advertisements that

25  are "political in nature."  *Id.* at Section IV(B)(2).  The

GCMNMTAC

policy's stated objectives include, among other things,
"maximizing advertising revenue" and "minimizing the resources
expended to resolve disputes relating to the permissibility of
certain political advertisements."  Citing the Rosen
Declaration, Docket No. 20, at paragraphs 29 and 32.

The policy's effect of "disallowing political speech
and allowing commercial speech only indicates that making money
is the MTA's main goal" and further demonstrates that the MTA
"opened the space in its capacity as a commercial actor."
Citing *New York Magazine*, 136 F.3d at 130.

Where, as here, the government acts in its
"proprietary capacity," it creates a limited public forum
subject to more deferential scrutiny.  *See Id.* at 129.  *See
also Lehman*, 418 U.S. at 303-04 (holding that no First
Amendment forum existed where city only allowed commercial
advertising on its transit system).  Also*, Lebron* 69 F.3d at
656 (Amtrak billboard was a limited public forum in light of
exclusion of political speech).  Also, *American Freedom Defense
Initiative v. Suburban Mobility Authority for Regional
Transportation*, 698 F.3d 885 at 890 (6th Cir. 2012) (noting
that transportation authority "has banned political
advertisements, speech that is the hallmark of a public
forum.")

Also, *American Freedom Defense Initiative*, 109
F.Supp.3d at 632 (when "public authorities exclude [political]

GCMNMTAC

1    ads, they create a limited public or nonpublic forum.")

2             In sum, the MTA's new advertising policy has created a

3    limited public forum.  In such a forum "restrictions on speech

4    that falls outside the designated category need only be

5    viewpoint neutral and reasonable to avoid running afoul of the

6    First Amendment."  Citing *Vaguely Qualified Productions* 2015 WL

7    5916699 at *8.  Accordingly, this is the standard that will be

8    applied to the Union's facial and as-applied challenges.

9             Beginning with the facial challenge, plaintiff claims

10   that the MTA's advertising policy on its face violates the

11   First Amendment.  "In raising a facial challenge, plaintiff

12   faces a heavy burden."  Citing *Amidon v. Student Association of*

13   *State University of New York at Albany*, 508 F.3d 94 at 98 (2d

14   Cir. 2007). "Facial invalidation is strong medicine and is used

15   sparingly and as a last resort."  *Id.*

16             In making a facial challenge to the MTA's policy, the

17   Union contends that the policy is (1) viewpoint discriminatory

18   and (2) so "vague and overbroad" that it affords the MTA

19   unbridled discretion to restrict speech.  Citing the Amended

20   Complaint, Docket No. 14, paragraph 18.  *See also* Plaintiff's

21   Brief, Docket No. 8, at pages 16-19.

22             In contending that the MTA's advertising policy is

23   "viewpoint based," plaintiff contends that the policy permits

24   the MTA to exclude speech that it subjectively deems to be

25   disputed or controversial.  Citing the Plaintiff's Brief,

GCMNMTAC

Docket No. 8, at pages 17-19.

In evaluating viewpoint neutrality in the context of a limited public forum, the Second Circuit has identified two guiding principles:  "First, the government may permissibly restrict content by prohibiting any speech on a given topic or subject matter."  Citing *Byrne v. Rutledge*, 623 F.3d 46 at 54, (2d Cir. 2010).  "Second, however, once the government has permitted some comment on a particular subject matter or topic, it may not then regulate speech in ways that favor some viewpoints or ideas at the expense of others."  *Id*. at page 55. "The government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise excludable subject."  *Id*.

The Union's argument that the MTA's advertising policy is facially discriminatory is not persuasive.  The policy does not prohibit advertisements based on the MTA's subjective view of what is a "disputed issue or cause."  Instead, the policy broadly prohibits all "political messages" and gives as examples of "political messages" advertisements that address "issues or causes" of a "economic, political moral, religion or social nature."  Citing the Amended Complaint, Exhibit C, Docket No. 14-3, at Section IV(B)(2).

As the Second Circuit stated in another transit case involving a similar prohibition on political advertisements, "It seems more sensible to read the language as a

GCMNMTAC

justification, however inartfully phrased, for a categorical
ban against political advertising rather than as a test for
discriminating against certain types of advertisements."
Citing *Lebron*, 69 F.3d at 658-59.

As in *Lebron*, a fair reading of the policy at issue
here is that it imposes a categorical ban on political
advertisements and therefore is not facially viewpoint
discriminatory.

Likewise not persuasive is the Union's argument that
the vagueness of the MTA's policy gives the agency "unbridled
discretion" in determining whether a proposed advertisement
should be excluded as political.  Citing the Plaintiff's Brief,
Docket No. 8, at pages 18 and 19.

As an initial matter, courts have repeatedly rejected
the argument that a ban on "political" advertisements is unduly
vague.  *See Lebron*, 69 F.3d at 658 (rejecting argument that a
"policy against political advertising on the Spectacular
[billboard was] void for vagueness").  Also, *Bryant v.Gates*,
523 F.3d 888, at 893-94 (D.C. Cir. 2008)("political" is a well
defined term and "far from being vague"; concluding that policy
prohibiting "political advertisements" is "not
unconstitutionally vague on its face").

The Union's "unbridled discretion" argument fails for
the same reason.  Unbridled discretion is not present where
there are "adequate standards to guide the official's

GCMNMTAC

decision."  Citing *Field Day LLC v. County of Suffolk*, 463 F.3d

167 at 176, (2d Cir. 2006).  "Perfect clarity and precise

guidance have never been required, however."  Citing *ward v.*

*Rock Against Racism*, 491 U.S.781 at 794 (1989).  Given that a

reasonable reading of the policy is that it provides for a

categorical ban on political advertisements, and given that

such restrictions have been upheld in other cases involving

public transit, the union has not demonstrated that the MTA's

policy gives the agency unbridled discretion to determine what

advertisements convey a political message.

        I conclude that the Union has not demonstrated that it

has a clear or substantial likelihood of success on its facial

challenge to the MTA's advertising policy.

        The Union has also raised an as-applied challenge to

the MTA's advertising policy.

        As an initial matter, the Union contends that it was

not reasonable for the MTA to conclude that its proposed

advertisement regarding a wage increase is political in nature.

        The political nature of the advertisement is obvious,

however.  The MTA and the Union are currently engaged in

collective bargaining negotiations regarding new labor

contracts.  Wages are a primary issue.  The proposed

advertisement is clearly designed to build public support for a

wage increase and to pressure the MTA, a public agency, to

agree to the Union's demands.  Collective bargaining agreements

GCMNMTAC

between public agencies such as the MTA and the Unions that represent employees of the public agency present political issues.  *See, e.g., Harris v. Quinn*, 134 S.Ct. 2618 at 2632 (2014)("In the public sector, core issues such as wages, pensions, and benefits are important political issues.")

Moreover, the union's proposed advertisement qualifies as a political message under either prong of the MTA's definition of "political in nature."  In advocating for a wage increase during a time when collective bargaining negotiations concerning wages are ongoing, the proposed advertisement is "directed or addressed to the action [or] prospective action of a governmental entity and is thus prohibited under Section IV(B)(2)(a) of the MTA's advertising policy.  In advocating for a wage increase, the proposed advertisement also "prominently or predominantly advocates a position regarding disputed economic or political issues" and is prohibited under Section IV(B)(2)(b) of the MTA's advertising policy.

Accordingly, the MTA reasonably determined that the Union's proposed advertisement was prohibited as "political in nature" under the MTA's advertising policy.

The Union contends, however, that an examination of how the MTA has applied its advertising policy in the past demonstrates that its rejection of the Union's ad here was not viewpoint neutral.  According to the Union, the MTA has previously permitted other advertisements of a similarly

GCMNMTAC

political nature.  Citing the Plaintiff's Supplemental Brief,

Docket No. 15, at page 4.

In support of its argument the union cites the

following:

First, an advertisement for the Freelancers Union

regarding private-sector wages stating, "Funny how corporations

are people when it comes to politics, but faceless machines

when it comes to paying actual people." *Id.*  This

advertisement first appeared on September 21, 2015, and was

scheduled to run until November 15, 2015.  Citing the Rosen

Declaration, Docket No. 20, at Exhibit F.  On October 2, 2015,

however, the MTA deemed the advertisement political and

directed that it be removed.  *Id.* at paragraph 48, Exhibit F.

Secondly, an advertisement for CNN regarding the

Republican Presidential Primary debate, which contained

photographs of candidates alongside prominently displayed

quotes.  Citing the Plaintiff's Supplemental Brief, Docket No.

15, at page 4.

Third, an advertisement for a Manhattan Mini Storage

which stated, "If you store your stuff outside the city, it may

come back Republican."  Citing the Schwartz Reply Declaration,

Docket No. 22, at paragraph 2, and Exhibit A.  According to the

MTA, however, the advertisement about the Mini Storage ran in

2012, before the MTA promulgated the advertising policy that is

at issue in this case.  See Supplemental Rosen Declaration,

GCMNMTAC

1    Docket No. 27, at paragraph 3.

2            Fourth, an advertisement placed by the New York City

3    Commission On Human Rights, which addressed local laws

4    regarding bathroom use by transgender people.  The

5    advertisement stated, "Use the restroom consistent with who you

6    are.  Look past pink and blue."  Citing the Schwartz Reply

7    Declaration, Docket No. 22, at paragraph 3, and Exhibit B.

8            Fifth, an advertisement placed by Justworks, a

9    computer software company, stating, "Zombie employees who crave

10   benefits.  They won't stop until they get what they want --

11   reasonable benefits."  *Id.* paragraph 6, at Exhibit E.

12           Sixth, an advertisement placed by Amalgamated Bank

13   concerning its checking and savings accounts.  The

14   advertisement included the following language, "Raising the

15   minimum wage lifts up all New Yorkers.  Join the bank that

16   fights for working families."  This ad also included the hash

17   tag, "Raise the wage."  *Id.* paragraph 7, and Exhibit F.  This

18   advertisement first appeared in September 2015 and was

19   scheduled to run until October 25, 2015.  *See Id.* paragraph 7,

20   and Exhibit G.  Also, the Supplemental Rosen Declaration,

21   Docket No. 27, at Exhibit 3.  On October 13, 2015, however,

22   after about two and a half weeks, the MTA decided that the ad

23   was political in nature and required that it be removed.

24   Citing the Schwartz Reply Declaration, Docket No. 22, at

25   paragraph 7; and the Supplemental Rosen Declaration, Docket No.

GCMNMTAC

1    27, at paragraph 8, and Exhibit 3.

2            Finally, the Union has cited advertisements for

3    certain movies and television shows, including "Snowden," which

4    is a film about Edward Snowden.  Also "Miss Sloan" which is a

5    film about a Washington, D.C. lobbyist.  And also a television

6    show called "The Man In the High Castle," which apparently

7    presents an alternate reality in which the Nazis won World War

8    II and occupied the United States.  Citing the Schwartz Reply

9    Declaration, Docket No. 22, at paragraphs 4, 5 and 8.  Also,

10   the Supplemental Rosen Declaration, Docket No. 27, at

11   paragraphs 5-6.

12           Moist of the advertisements cited by plaintiff present

13   no support for plaintiff's arguments concerning viewpoint

14   discrimination.  For example, the advertisements regarding the

15   films and the television show and the Republican Presidential

16   Primary debate on CNN do not in my judgment "prominently or

17   predominantly" advocate or express a political viewpoint.

18   Indeed, these advertisements promote commercial products, or in

19   the case of the presidential primary debate, a televised media

20   event.

21           Similarly, the advertisement for Justworks relates to

22   the services that company provides to small business in

23   connection with compliance, human resources, payroll, benefits

24   and other employment related issues and talcs.  Citing the

25   Supplemental Rosen Declaration, Docket No. 27, paragraph 7.

GCMNMTAC

1          The Justworks advertisement states, "Your employees

2     enroll and manage their benefits online on one place" and "our

3     rates are often more affordable than small business can get on

4     their own."  Citing the Schwartz Reply Declaration, Docket No.

5     22, at paragraph 6, and Exhibit E.  In short, the Justworks

6     advertisement promotes that company's commercial services.  The

7     MTA's approval of this advertisement does not demonstrate

8     viewpoint discrimination.

9          The advertisement placed by the New York City

10    Commission On Human Rights also does not demonstrate viewpoint

11    discrimination.  Section IV(A)(2) of the MTA's advertising

12    policy permits "governmental advertising," including notices or

13    messages of the city of New York and its departments "that

14    advance specific governmental purposes."  Citing the Amended

15    Complaint, Docket No. 14, at Exhibit C.  The Commission's

16    advertisement serves the governmental purpose of informing New

17    York City residents about the law -- namely, that people are

18    permitted to use bathroom facilities consistent with their

19    gender identity, regardless of the sex they were assigned at

20    birth.  The ad states, "Use the restroom consistent with who

21    you are" and includes the tagline "In New York City it's the

22    law.  No questions asked."  Citing Schwartz Reply Declaration,

23    Docket No. 2, at Exhibit B.  In short, this advertisement is in

24    the nature of a public service announcement advising the public

25    about New York City laws that protect transgender people.  The

GCMNMTAC

MTA's approval of this ad is not evidence of viewpoint

discrimination.

        The advertisements placed by the Freelancers Union and

the Amalgamated Bank are, however, political in nature.  The

MTA asserts that the approval of these ads was a mistake that

occurred "during the initial months of the implementation of

the new policy."  Citing the Rosen declaration, Docket No. 20,

at paragraph 48; and the Supplemental Rosen Declaration, Docket

No. 27, at paragraph 8.  The MTA attributes the alleged error

to its outside contractor and states that it had the

advertisements removed as soon as it became aware of them.

Citing the Rosen Declaration, Docket No. 20, at paragraph 48,

and Exhibit F.  Also, the Supplemental Rosen Declaration,

Docket No. 27, at paragraph 8 and Exhibit 3.

        In *Vaguely Qualified Productions LLC v. Metropolitan

Transportation Authority*, 2015 WL 5916699 (S.D.N.Y. October 7,

2015), Judge McMahon considered the MTA's prior approval of the

Freelancers Union advertisement in assessing whether the MTA's

denial of advertising space for a film called "The Muslims Are

Coming!" was viewpoint discriminatory.

        The film "The Muslims Are Coming!" is about a group of

American Muslim comedians as they travel across the United

States performing stand-up comedy.  The film was sold on DVD

and Blu-Ray and was available for purchase through online

viewing.  Plaintiff wished to purchase MTA advertising space to

GCMNMTAC

promote the film.  The proposed ads used satire, irony, and

other comedic techniques to show that "American Muslims are

ordinary people."  Citing *Vaguely Qualified* 2015 WL 5916699 at

*3.  The MTA rejected the proposed ads as "political in nature"

under the MTA's new advertising policy.

In granting plaintiff a preliminary injunction

requiring the MTA to run plaintiff's ads, Judge McMahon noted

that the proposed ads promoted and solicited the sale of

plaintiff's film, and thus were "undoubtedly commercial."  She

also emphasized "the fundamentally commercial nature of the

message" apparent in the ads.  *Id.* at *9.  Judge McMahon

recognized, however, that although the ads were fundamentally

commercial in nature, they could also be "political in nature"

under the MTA's new advertising policy.  *Id.*  Judge McMahon

went on to find, however, that the plaintiff's humorous and

satirical statements "suggesting that American Muslims are just

like other Americans" were not prominently or predominantly

political.  *Id.*

In concluding that the MTA's rejection of plaintiff's

ads had not been viewpoint neutral, Judge McMahon addressed the

Freelancers Union ad which is cited by the Union here.  Judge

McMahon stated that "the fact that [the Freelancers Union] ad

was initially accepted for publication and actually appeared in

the subways -- until it became inconvenient to run it because

of the pendency of this lawsuit -- utterly undermines the MTA's

GCMNMTAC

1    assertion that its decision as to VQP's ads was viewpoint

2    neutral"  *Id.* at *11.

3            The *Vaguely Qualified* case does not, in my view,

4    support the issuance of an injunction in this case.  *Vaguely*

5    *Qualified* involves an advertisement for a film, a commercial

6    product, and that fact was very important to Judge McMahon's

7    determination.  *See Id.* at *3.  The case before me does not

8    involve a commercial product and the message conveyed by the

9    Union's ad is much more overtly political than the humorous and

10   satirical ads at issue in *Vaguely Qualified*.

11           The MTA's handling of the Freelancers Union and

12   Amalgamated Bank ads likewise does not persuade me that the MTA

13   in rejecting the union's ad here was acting in a manner that

14   was not viewpoint neutral.  The MTA contends that these two

15   advertisements were mistakenly approved by the MTA's outside

16   contractor, Outfront Media, early in the implementation of the

17   new advertising policy.  There is some evidence that supports

18   that contention.  These two advertisements were approved by the

19   outside contractor within the first six months after the new

20   advertising policy was adopted.  *See* Rosen Declaration, Docket

21   No. 20 at paragraph 43 and Exhibit F; the Schwartz Reply

22   Declaration, Docket No. 22, at Exhibit G; the Supplemental

23   Rosen Declaration, Docket No. 27, at Exhibit 3.

24           Each advertisement ran for about two and a half weeks

25   or less before the MTA ordered that the ad be pulled.  Citing

GCMNMTAC

the Rosen Declaration, Docket No. 20, at paragraph 48 and Exhibit F; the Schwartz Reply Declaration, Docket No. 22, at paragraph 7; and the Supplemental Rosen Declaration, Docket No. 27, at paragraph 8 and Exhibit 3.

While Judge McMahon found that the MTA pulled the Freelancers Union ad as part of a litigation strategy, the fact of the matter is that both the Freelancers Union and the Amalgamated Bank ad were pulled very quickly, suggesting that the MTA's initial approval of these ads was, in fact, mistaken.

The MTA has also offered evidence of a number of instances in which it has rejected proposed advertisements as "political in nature." For example, the MTA has rejected an ad proposed by an animal rights group calling attention to puppy mills, which are commercial breeding facilities that some argue are inhumane. Citing the Rosen Declaration, Docket No. 20, at paragraph 40.

The MTA has also rejected a proposed advertisement promoting the adoption of certain laws concerning the sale of tobacco products at drugstores. *Id.* at paragraph 45.

The MTA has rejected ads addressing the level of taxes in New York State. *Id.*

And the MTA has rejected proposed ads addressing political issues in the Middle East. *Id.*

Under all the circumstances, I find that the Union has not demonstrated a clear or substantial likelihood of success

GCMNMTAC

1    on its claim that the MTA's rejection of its ad was not

2    viewpoint neutral.

3         Because the Union has not shown a clear or substantial

4    likelihood of success on either its facial or as-applied

5    challenge to the MTA's advertising policy either on its face or

6    as applied to the Union's proposed ad, the motion for a

7    preliminary injunction is denied.

8         Is there anything else?

9         MR. SCHWARTZ:  No, your Honor.

10        MS. STEINMAN:  No, your Honor.

11        (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25